UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ALICE LUNE (f/k/a MARIO GARCIA BANUCHI, and prosecuted
as MARI MUZI),

                                                    Case No.:

                    Plaintiff,
                                                    **COMPLAINT**

        - v -

CITY OF NORTH TONAWANDA, OFFICER GREGORY BENJAMIN,
OFFICER ANTHONY COSENTINO, OFFICER JOSEPH CAKE,
OFFICER BRADLEY JANZEN, OFFICER DONALD R. HOLLER,
KAYLEIGH M. BRADFIELD-MCKENZIE, NIAGARA COUNTY,
NIAGARA COUNTY SHERIFF'S OFFICE, and JOHN/JANE DOES

                    Defendants.
-------------------------------------------------------------------x

        Plaintiff Alice Lune ("Ms. Lune" or "Plaintiff"), by and through undersigned

counsel, brings this civil rights action under 42 U.S.C. § 1983 against the City of

North Tonawanda, individual officers, and a city clerk who knowingly targeted and

unlawfully arrested her while she was experiencing a mental-health crisis. Ms. Lune

alleges that Defendants violated her First, Fourth, and Fourteenth Amendment rights,

discriminated against her on the basis of disability and gender identity, maliciously

prosecuted her with a baseless felony charge, and failed to provide adequate medical care.

In support of her claims, she alleges as follows:

## PRELIMINARY STATEMENT

        1.      This case arises from the decision by law enforcement officers in the

City of North Tonawanda to treat a vulnerable transgender woman with a severe and

known mental health condition as a criminal and a terrorist rather than as a person in

desperate need of help.

2.     Plaintiff Alice Lune, a 31-year-old transgender woman with a history of psychiatric hospitalizations, psychosis, and substance-use disorder, was subjected to a malicious prosecution based on a baseless felony charge after she sought help from city officials.

3.     The Defendants' actions were taken despite their prior knowledge of Ms. Lune's fragile mental state, which they had documented just three weeks before her arrest during a wellness check initiated by her concerned mother.

4.     On January 24, 2025, while in crisis, Ms. Lune called the North Tonawanda City Court to express her frustration that local authorities were ignoring her repeated reports of having been previously kidnapped and assaulted.

5.     After Ms. Lune physically appeared at City Hall moments later and continued to protest, Defendants arrested, jailed, and charged her with "Making a Terroristic Threat," a Class D felony, based on the statements she made on the phone and in person.

6.     This charge was predicated on a statement from a court clerk, Kayleigh Bradfield-McKenzie, who claimed Ms. Lune threatened to bring a "nuclear bomb" to City Hall.

7.     Ms. Lune vehemently denies making any such threat. This incident occurred just four days after a presidential inauguration, and in response to the new administration's public stance on gender, Ms. Lune made political statements to express her anguish, stating in substance: "If you don't recognize my gender, then I don't recognize your nationality and I hope that some day all the US flags in the world get dissolved by nukes." Her statements were an expression of frustration with police inaction and the hostile political climate for transgender individuals.

8.     Despite their own arrest and booking paperwork noting Ms. Lune was showing signs of mental illness and appeared to be "Mentally Disordered," Defendants chose to escalate the situation.

9.     Body camera footage captured an officer describing the terroristic threat charge as "a winner," demonstrating a deliberate intent to punish Ms. Lune rather than provide care.

10.     As a direct result of Defendants' malicious actions, Ms. Lune was incarcerated for four months, during which she was denied access to necessary medical treatment, including her hormone replacement therapy.

11.     This ordeal caused her to suffer severe emotional distress, physical decline, and the loss of her housing and all personal property.

12.     The felony charge was ultimately dismissed on April 28, 2025.

13.     Ms. Lune brings this action to vindicate her constitutional rights under the First, Fourth, and Fourteenth Amendments; to obtain compensation for the profound injuries she suffered; and to compel systemic changes in how the City of North Tonawanda treats transgender individuals and those with mental illnesses.

## **JURISDICTION AND VENUE**

14.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in Niagara County, which is within the Western District of New York.

3

## PARTIES

16.     Plaintiff Alice Lune is a citizen of New York who resides in the City of North Tonawanda. She is a 31-year-old transgender woman with a long history of mental health challenges, including a formal diagnosis of Schizoaffective Disorder, bipolar type, as well as psychosis, substance-use disorder, and traumatic brain injury.

17.     Ms. Lune uses she/her pronouns, though Defendants repeatedly misgendered her in official records, listing her sex as "Male."

18.     During the events at issue, she resided at 142 Oliver Street, Apartment 3, North Tonawanda, New York.

19.     Defendant City of North Tonawanda is a municipal corporation organized under the laws of the State of New York.

20.     The City operates and oversees the City of North Tonawanda Police Department ("NTPD") and is responsible for the policies, practices, and customs of its Police Department and its other employees, including those at the City Court.

21.     Defendant Officer Gregory Benjamin is, upon information and belief, a police officer employed by NTPD.

22.     Officer Benjamin performed a wellness check at Plaintiff's apartment on January 1, 2025, where he was made aware of her mental health crisis. He also was the primary responding and reporting officer for the incident on January 24, 2025, and signed all three criminal complaints against Ms. Lune. He is sued in his individual and official capacities.

23.     Defendant Officer Anthony Cosentino is, upon information and belief, a police officer employed by NTPD.

24. Officer Cosentino was part of the police personnel assigned to the incident on January 24, 2025, when Alice was arrested at North Tonawanda City Hall. He is sued in his individual and official capacities.

25. Defendant Officer Joseph Cake is, upon information and belief, a police officer employed by NTPD.

26. Officer Cake was directly involved in processing Alice's arrest on January 24, 2025, and he was listed as one of the arresting officers for this incident. He also was identified as the screening officer for the "Suicide Prevention Screening Guidelines" form, which was completed on the day of Alice's arrest. He is sued in his individual and official capacities.

27. Defendant Officer Bradley Janzen is, upon information and belief, a police officer employed by NTPD. He was listed as a potential law enforcement witness for Plaintiff's criminal prosecution as an individual who "ha[s] evidence or information relevant to the charges."

28. Upon information and belief, Officer Janzen was part of the police personnel assigned to the incident on January 24, 2025, and he was involved in authorizing and processing Alice's arrest. He is sued in his individual and official capacities.

29. Defendant Officer Donald R. Holler is a New York State court officer who confronted Plaintiff at City Hall on January 24, 2025, ordered her to leave, attempted to handcuff her and authorized her arrest.

30. Officer Holler also prepared a statement in support of Alice's charges and was listed as the complainant who instigated, approved, and encouraged the filing of

criminal charges against Plaintiff rather than refer her for mental-health treatment. He is sued in his individual and official capacities.

31.     Defendant Kayleigh Bradfield-McKenzie is a court clerk at the North Tonawanda City Court. She answered Plaintiff's call on January 24, 2025, and made statements accusing Plaintiff of making a bomb threat, which she knew or should have known were false or exaggerated. She is sued in her individual and official capacities.

32.     Defendant Niagara County is a municipal corporation organized under the laws of the State of New York. Niagara County operates and is responsible for the Niagara County Jail, which houses pretrial detainees and individuals committed by court order.

33.     Defendant Niagara County Sheriff's Office is the governmental agency responsible for the custody, care, and medical treatment of all detainees held at the Niagara County Jail, including pretrial detainees. The Niagara County Sheriff's Office is responsible for the policies, practices, and customs related to the detention and care of jail inmates, including medical care, mental health care, and the provision of necessary medications.

34.     John/Jane Does are unknown employees or agents of the City of North Tonawanda and NTPD who participated in Plaintiff's arrest, detention or prosecution or were responsible for policies and practices that violated Plaintiff's rights. Their identities will be added once discovered.

## FACTUAL ALLEGATIONS

### A.    Plaintiff's Mental-Health History and Vulnerability

33.    Alice Lune is a 31-year-old transgender woman who has suffered from severe and persistent mental health disorders for over a decade.

34.    Her history includes psychiatric hospitalizations at age 17 in Puerto Rico and later in Thurston County, Washington.

35.    Ms. Lune has received multiple diagnoses, including Schizoaffective Disorder, bipolar type, Post-Traumatic Stress Disorder (PTSD), and Gender Dysphoria.

36.    She lives with psychosis and has experienced hallucinations and persecutory delusions, including beliefs that she was abducted by aliens and that a local chiropractor had attempted to kill her.

37.    Plaintiff also struggles with substance-use disorder. She has a history of using heroin to manage physical pain and survived a fentanyl overdose in January 2021, which required the administration of Narcan.

38.    Ms. Lune's psychological state was exacerbated around 2022 when Evergreen Health Services, the clinic providing her gender-affirming hormone replacement therapy (HRT), abruptly terminated her care.

39.    This sudden cessation of essential medical treatment caused her severe psychological distress. At the time of her arrest, Ms. Lune had been without formal gender-affirming care for approximately three years.

40.    In the months leading up to her arrest, Ms. Lune's mental health crisis was escalating. She made numerous calls to the non-emergency numbers for the City of North Tonawanda and the City of Buffalo, reporting that she had been kidnapped by an individual from a local tattoo shop.

7

41.     Plaintiff's pleas for help, however, were dismissed by authorities, and during one interaction, officers allegedly told her to "move to Russia."

42.     In December 2022, after making threats at Evergreen Health Services due to her distress, she was taken by crisis services to Niagara Falls Memorial Hospital for psychiatric care.

43.     This history demonstrates a clear pattern of authorities being aware of Ms. Lune's severe mental illness and her tendency to act out when in crisis, long before the events of January 24, 2025.

**B.     Police Knowledge of Plaintiff's Condition: The Wellness Check**

44.     On January 1, 2025, approximately three weeks before her arrest, the North Tonawanda Police Department was put on direct notice of Ms. Lune's fragile mental state.

45.     At approximately 10:45 AM, Ms. Lune's mother, Irene Banuchi, called the NTPD to request a "Check on Welfare" at Ms. Lune's apartment, located at 142 Oliver Street. Ms. Banuchi was concerned because she had not had any contact with her daughter since December 16, 2024.

46.     The official police report (CAD Narrative) for this incident documents that Ms. Banuchi informed the dispatcher that her "Last conversation [with Ms. Lune] was an argument over therapy."

47.     The report explicitly notes "No specific threats made."

48.     The "Nature of Call" entry further specifies "mental health tox" as a relevant factor.

8

49.    Defendant Officer Gregory Benjamin was one of the two officers who responded to the wellness check.

50.    Officer Benjamin made contact with Ms. Lune, who agreed she would call her mother after her birthday on January 4th.

51.    This wellness check establishes that the City of North Tonawanda and, specifically, Defendant Officer Benjamin, had direct, first-hand knowledge that Ms. Lune was a person struggling with significant mental health issues, that her family was actively trying to get her into therapy, and that she was not considered a threat just weeks before they chose to arrest and charge her with a violent felony.

## C.    January 24, 2025—The City Hall Incident and Arrest

52.    On the morning of January 24, 2025, at approximately 8:43 AM, Ms. Lune called the North Tonawanda City Court in a state of crisis.

53.    Plaintiff was deeply frustrated by the continued failure of local authorities to investigate her repeated reports of being kidnapped and drugged by an individual named Mark Madden from a local tattoo shop.

54.    The call was answered by Defendant Kayleigh Bradfield-McKenzie, a clerical assistant.

55.    According to Ms. Bradfield-McKenzie's sworn deposition and her statement captured on body camera footage, she claimed Ms. Lune said that "the people in City Hall need to know that if the[ir] gender isn't real, then the flag flying at City Hall isn't real," threatened to "come with a nuclear bomb," and called her a "f***ing slut" before hanging up.

56.    Ms. Bradfield-McKenzie immediately informed her supervisor, Jennifer Steele, who instructed her to notify the court officers.

57.    Ms. Lune vehemently denies threatening to bring a bomb to City Hall, and rather her call was a desperate attempt to get authorities to act on her kidnapping report.

58.    Plaintiff recalls using hyperbolic and political language out of desperation, stating her hope that if police failed to protect her, "all the American flags in the world get dissolved one day by nukes."

59.    Plaintiff also made statements directed at the political climate, saying "if you don't believe in my gender, I don't believe in your nationality."

60.    Within approximately five minutes of the phone call, Ms. Lune arrived at City Hall. According to the supporting deposition of Defendant Officer Donald R. Holler, Ms. Lune entered the building "screaming obscenities."

61.    Officer Holler stated he approached Ms. Lune and "asked Mari to stop screaming and yelling. Mari refused and screamed louder."

62.    Officer Holler then ordered Ms. Lune to leave the building, informing her she was "no longer welcome."

63.    When Plaintiff again refused, Officer Holler informed her she was under arrest and he grabbed her arms and handcuffed her.

64.    Relying entirely on the disputed statements from Ms. Bradfield-McKenzie and the account from Officer Holler, Defendant Officer Benjamin filed three criminal complaints against Ms. Lune, charging her with the following offenses:

a)  Making a Terroristic Threat (Penal Law § 490.20, subd. 1), a Class D Felony.

b)  Resisting Arrest (Penal Law § 205.30), a Class A Misdemeanor.

c) Disorderly Conduct (Penal Law § 240.20, subd. 3), a Violation.

## D. Malice, Discriminatory Animus, and Deliberate Disregard for Plaintiff's Condition

65. Defendants' decision to charge Ms. Lune with a felony was not a good-faith misinterpretation of her words but a malicious act, characterized by a deliberate disregard for her known mental health crisis and discriminatory animus toward her gender identity.

66. Body camera footage from the incident reveals that officers, including Defendant Benjamin, did not immediately conclude that a felony had occurred. Instead, they discussed what charges might be possible, with one officer, upon information and belief, Officer Benjamin, stating he was going to "scour through the Penal Code and see what's applicable."

67. Defendants considered and dismissed a lesser charge of harassment, with an officer noting that calling the clerk a "fucking slut . . . is not really like illegal."

68. After this deliberation, one officer, upon information and belief, Officer Benjamin, referred to the felony "terroristic threats" charge as "a winner."

69. The officers were fully aware of Ms. Lune's potential need for psychiatric intervention.

70. The body camera footage captured a discussion between Officer Benjamin and others about having a "730" mental health examination performed.

71. Despite this acknowledgment and their prior knowledge from the January 1 wellness check, Officer Benjamin and the other defendant officers deliberately chose to pursue the most serious criminal charge instead of activating crisis intervention services as dictated by NTPD policy.

72.     This deliberate disregard is further evidenced in the Defendants' own paperwork. The Arrest Info Report, prepared in relation to the arrest, officially notes Ms. Lune's "Condition" as "App to be Mentally Disordered." On the "Suicide Prevention Screening Guidelines" form, Defendant Officer Cake documented his observations that Ms. Lune was acting in a "Strange manner" and showing signs of "Mental illness."

73.     Defendants also displayed discriminatory animus by repeatedly and intentionally misgendering Ms. Lune in official documents. The official Arrest Report lists her sex as "M," and the court cover sheet lists her sex as "Male."

74.     This was not an error; a police compliance checklist explicitly states: "Defendant identifies as a female but is a biological male. CAD & state records reflects (sic) both sexes and paperwork may have discrepancies." This demonstrates a conscious refusal to acknowledge Ms. Lune's gender identity, which informed their hostile treatment of her.

**E.  Incarceration, Denial of Medical Care, and Subsequent Harm**

75.     As a direct result of the Defendants' malicious actions, Ms. Lune was incarcerated for approximately four months, from her arrest on January 24, 2025, until the felony charge was dismissed on or about April 28, 2025.

76.     The experience was profoundly traumatic. Ms. Lune spent her first days in jail "screaming," and jail medical records from that time note she was observed to have "bizarre behavior, screaming obscenities at the officers and was delusional, paranoid and agitated."

77.     Throughout her detention, Ms. Lune was denied adequate and necessary medical care.

78.     Despite Plaintiff's well-documented history of psychosis, she did not receive psychiatric treatment.

79.     Furthermore, Plaintiff was denied her essential gender-affirming medical care, causing significant distress. According to a forensic evaluation, she "freaked out" upon learning another inmate was receiving gender-affirming medication while her own requests were denied.

80.     The prolonged and wrongful incarceration led to the complete loss of Ms. Lune's housing and personal property.

81.     Facing eviction from her apartment, Plaintiff's mother was forced to hire people to remove and discard all of her belongings. Ms. Lune lost everything she owned.

82.     This entire ordeal—the arrest, the months of incarceration without proper medical care, and the loss of her home—caused Ms. Lune severe and ongoing emotional distress and trauma.

83.     After the felony charge was finally dismissed, she was transferred from jail to a hospital to receive the psychiatric care that Defendants should have ensured she received in the first place.

## F.  **Defendants' Policies, Customs, and Failures to Train**

84.     The City of North Tonawanda and the NTPD maintained informal and unwritten official policies or customs of criminalizing individuals experiencing mental health crises rather than providing appropriate medical care, in direct contradiction to their own stated procedures.

85. The NTPD's "Crisis Intervention Incidents" policy (NTPD Policy 409) explicitly states that "Individuals may benefit from treatment as opposed to incarceration" and that officers should use "non-violent strategies and techniques to decrease the intensity of a situation" and "employ alternatives to force."

86. Despite this official policy, and despite their direct knowledge from the January 1 wellness check and their own observations on January 24 that Ms. Lune was mentally ill, Defendants failed to call crisis services or employ any de-escalation techniques. Instead, their custom and practice was to escalate the encounter, culminating in a malicious felony charge.

87. Furthermore, the City failed to adequately train or supervise its officers on how to interact with transgender individuals in a non-discriminatory manner.

88. The City police department's "Bias-Based Policing" policy (NTPD Policy 401) strictly prohibits discrimination based on "gender identity or expression" and mandates that officers "perform his/her duties in a fair and objective manner."

89. The repeated misgendering of Ms. Lune in official arrest and court documents, however, demonstrates a custom of deliberate indifference to this policy and a failure to train officers on its importance.

90. The City ratified its officers' unconstitutional conduct by allowing the baseless felony prosecution of Ms. Lune to continue for four months. Despite having overwhelming evidence of her severe mental health crisis and the dubious nature of the alleged "terroristic threat," the City pursued the charge until it was dismissed, thereby endorsing the officers' malicious actions.

91. This conduct reflects a departmental culture that prioritizes securing charges over providing aid. The body camera footage capturing an officer, upon

information and belief, Officer Benjamin, calling the felony charge "a winner" in front of his colleagues and other City employees and police officers illustrates a custom of overcharging vulnerable individuals.

92.    This custom, coupled with the City's failure to supervise and discipline the officers involved, constitutes deliberate indifference and was the moving force behind the violation of Ms. Lune's constitutional rights.

### G. Conditions of Confinement and Denial of Medical Care at the Niagara County Jail

93.    On or around the time of her arrest on January 24, 20-25, Ms. Lune was booked into the Niagara County Jail as a pretrial detainee.

94.    During her approximately four-month incarceration at the Niagara County Jail, she spent her first several days screaming in obvious psychiatric distress, yet the jail received no immediate mental health intervention. Only after days of visible psychiatric crisis did jail medical staff start on antipsychotic and anxiety medication.

95.    Ms. Lune suffered from a severe and spreading ringworm/fungal infection infecting her from her toes to her head and ears. Rather than provide systemic antifungal treatment appropriate for such an extensive infection, jail medical staff provided only topical over-the-counter medicine, which proved inadequate to address the condition.

96.    Ms. Lune suffered from an untreated head injury and traumatic brain injury sustained from a chiropractor's violent neck manipulation in approximately September 2-23. Jail medical staff were aware of should have been aware of this known condition but failed to evaluate or provide treatment.

97.    Ms. Lune experienced painful cyst outbreaks across her body, leaving bleeding marks and permanent scars. The jail's medical staff failed to provide adequate treatment for this condition.

98.    Despite a well-documented 10-year history of hormone replacement therapy (estrogen), jail officials refused to provide or continue her hormone therapy throughout her approximately four-month incarceration, causing her significant physical and psychological distress.

99.    Upon information and belief, at least one other inmate at the Niagara County Jail was provided gender-affirming medication during the same period in which Ms. Lune was denied hormone therapy, demonstrating that the jail had the capacity to provide such treatment but selectively denied it to Ms. Lune.

100.    Ms. Lune's known psychiatric conditions—including schizoaffective disorder (bipolar type), psychosis, substance-use disorder, and traumatic brain injury—required specialized psychiatric care that the jail failed to provide throughout her incarceration.

101.    Upon Ms. Lune's release from jail in or around late April 2025, she was transferred directly to a psychiatric hospital, where she has remained for months. This immediate transfer to a psychiatric hospital underscores that she required mental health treatment—not incarceration—from the beginning of her detention.

102.    During her incarceration, Ms. Lune lost her apartment and nearly all of her personal property. Her mother was forced to pay to have Ms. Lune's apartment cleared to avoid a formal eviction proceeding, resulting in significant financial and emotional hardship for her family.

103.   The totality of the jail's failures—the delayed psychiatric intervention, the denial of hormone therapy, the inadequate treatment of serious physical conditions, and the prolonged detention of a person in acute mental health crisis—constituted deliberate indifference to Ms. Lune's serious medical needs in violation of her Fourteenth Amendment rights as a pretrial detainee.

## FIRST CAUSE OF ACTION

### Fourth and Fourteenth Amendments – Malicious Prosecution
### (42 U.S.C. § 1983)
### <u>Against All Defendants</u>

104.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

105.   Defendants, including but not limited to Officer Benjamin, Officer Holler, and Clerk Bradfield-McKenzie, initiated and pursued a criminal prosecution against Ms. Lune for the Class D felony of Making a Terroristic Threat. This prosecution was commenced without probable cause.

106.   The charge was based solely on Ms. Lune's speech during a phone call, which, even as alleged by Defendant Bradfield-McKenzie, constituted hyperbolic rhetoric from a person Defendants knew was in the midst of a severe mental health crisis.

107.   No reasonable officer would have believed that Ms. Lune, an unemployed individual known to be "Mentally Disordered," had the intent or capability to acquire and use a "nuclear bomb."

108.   The prosecution was undertaken with actual malice. Evidence of this malice includes body camera footage capturing an officer, upon information and belief,

Officer Benjamin, referring to the felony charge as "a winner," demonstrating an intent to secure a severe charge rather than to justly apply the law.

109.    Defendants pursued this charge despite acknowledging Ms. Lune's need for a mental health evaluation and having direct, prior knowledge of her psychiatric history from the wellness check conducted by Defendant Benjamin on January 1, 2025.

110.    The criminal proceedings terminated in Ms. Lune's favor when the felony charge was dismissed on or about April 28, 2025.

111.    As a result of this malicious prosecution, Ms. Lune suffered a grievous seizure of her person in violation of the Fourth Amendment, as she was incarcerated for approximately four months following her arraignment.

112.    As a direct and proximate result of Defendants' malicious prosecution, Ms. Lune suffered the loss of her liberty, severe emotional distress, the loss of all her personal property and housing, and other significant damages.

## SECOND CAUSE OF ACTION

### First Amendment – Retaliation for Protected Speech
### (42 U.S.C. § 1983)
### Against All Defendants

113.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

114.    Ms. Lune's statements to city officials on January 24, 2025, constituted speech protected by the First Amendment. This includes her complaints about the police's failure to investigate her kidnapping reports, as well as her political expressions regarding gender identity, nationality, and government symbols.

115.    In direct retaliation for Ms. Lune exercising her First Amendment rights, Defendants took adverse action against her by arresting her, charging her with a Class D felony, and causing her to be incarcerated for four months.

116.    Defendants' actions were motivated by the content and viewpoint of Ms. Lune's speech. The criminal complaints and the officers' own narratives explicitly cite her words as the sole basis for the arrest. This demonstrates that Defendants arrested and prosecuted Ms. Lune to punish her for criticizing city inaction and to silence her unpopular views.

117.    These retaliatory actions would deter a person of ordinary firmness from continuing to engage in such protected speech. As a direct and proximate result of the Defendants' unconstitutional retaliation, Ms. Lune suffered the loss of her liberty, severe emotional distress, and other significant damages.

### THIRD CAUSE OF ACTION

### Fourteenth Amendment – Equal Protection
### (42 U.S.C. § 1983)
### <u>Against All Defendants</u>

118.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

119.    Defendants, acting under color of state law, deprived Ms. Lune of her right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution by intentionally discriminating against her on the basis of her status as a transgender woman.

120.    This discriminatory animus is evidenced by Defendants' persistent and deliberate misgendering of Ms. Lune in official documents. The Arrest Info Report

lists her sex as "M," and the Court Cover Sheet lists her sex as "Male." A police compliance checklist explicitly acknowledges this practice, stating: "Defendant identifies as a female but is a biological male. CAD & state records reflects (sic) both sexes and paperwork may have discrepancies." This demonstrates a conscious and policy-driven refusal to recognize her gender identity.

121.    Further evidence of this discrimination includes the denial of medically necessary gender-affirming hormone replacement therapy to Ms. Lune during her four-month incarceration, despite providing such treatment to other incarcerated individuals.

122.    Defendants treated Ms. Lune differently than similarly situated cisgender individuals. A cisgender person experiencing a severe and documented mental health crisis would have been provided with care or de-escalation in accordance with NTPD policy, not arrested and maliciously prosecuted for a felony based on hyperbolic speech.

123.    Defendants' actions, including the decision to charge her with a felony and deny her medical care, were motivated by discriminatory animus toward her gender identity and lacked any legitimate, non-discriminatory justification.

124.    As a direct and proximate result of this unconstitutional discrimination, Ms. Lune suffered significant damages as described herein.

## FOURTH CAUSE OF ACTION

### First, Fourth, and Fourteenth Amendments – Failure to Intervene
### (42 U.S.C. § 1983)
### <u>Against All Defendants</u>

125.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

126.    All law enforcement officers have an affirmative duty to intervene to prevent the constitutional rights of citizens from being violated by other officers when they are in a position to do so.

127.    Defendants Benjamin, Cosentino, Cake, Janzen, and Holler were present during the arrest and/or charging of Ms. Lune on January 24, 2025. They each had knowledge that a constitutional violation was occurring and a realistic opportunity to intervene to prevent the false arrest and malicious prosecution of Ms. Lune.

128.    These Defendants knew that the felony charge lacked probable cause, as it was based on the protected speech of a person they recognized as being "Mentally Disordered." Their own discussions captured on body camera footage, including the consideration of a "730" mental health examination, confirm their awareness of her crisis.

129.    Despite this knowledge and opportunity, each of these Defendants failed to take any reasonable action to stop their fellow officers from pursuing the baseless felony charge. None intervened to de-escalate the situation, to advocate for calling crisis services instead of making an arrest, or to object to the filing of a felony charge that was clearly unwarranted.

130.    As a direct and proximate result of the Defendants' failure to intervene, Ms. Lune was wrongfully arrested and incarcerated for four months, suffering the loss of her liberty, severe emotional distress, and other damages as described herein.

## FIFTH CAUSE OF ACTION

### First, Fourth, and Fourteenth Amendments – Civil Conspiracy
### (42 U.S.C. § 1983)
### <u>Against All Defendants</u>

131.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

132.    Defendants, acting in concert, formed an agreement and reached a mutual understanding to deprive Ms. Lune of her constitutional rights. This agreement involved transforming the hyperbolic speech of a person in a known mental health crisis into a colorable felony charge for the purpose of punishing and silencing her.

133.    In furtherance of this conspiracy, Defendants committed several overt acts:

    a)  Defendant Bradfield-McKenzie provided a statement to police that was false and a gross mischaracterization of Ms. Lune's words.

    b)  Defendant Holler effectuated an arrest based on this pretext.

    c)  Defendant Benjamin and other officers then collectively deliberated on how to maximize the charges, ultimately filing a baseless felony complaint.

134.    The body camera footage provides direct evidence of this agreement. The officers' discussion about "scour[ing] through the Penal Code," dismissing lesser offenses, and ultimately agreeing that the terroristic threat charge was "a winner" demonstrates a meeting of the minds to inflict the most severe harm possible, rather than to conduct a good-faith investigation.

135.    The conspiracy deprived Ms. Lune of her clearly established rights under the First, Fourth, and Fourteenth Amendments. As a direct and proximate result of the Defendants' conspiratorial actions, Ms. Lune was wrongfully incarcerated for four months and suffered the severe injuries and damages described herein.

## SIXTH CAUSE OF ACTION

### *Monell* Claim
### (42 U.S.C. § 1983)
### <u>Against the City of North Tonawanda</u>

136.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

137.    The City of North Tonawanda is liable under 42 U.S.C. § 1983 and *Monell v. Department of Social Services* because the violations of Ms. Lune's constitutional rights were not the result of isolated acts by individual officers, but were caused by the City's official policies, widespread and persistent customs, and failures to train and supervise its employees, which amounted to deliberate indifference to the rights of its citizens.

138.    The City maintained a custom and practice of criminalizing individuals experiencing mental health crises instead of providing care.

139.    The NTPD's official "Crisis Intervention Incidents" policy (Policy 409) mandates that officers use "conflict resolution and de-escalation techniques" and explicitly recognizes that individuals in crisis "may benefit from treatment as opposed to incarceration." Despite this written policy, the actions of the Defendant officers on January 24, 2025, demonstrated a deeply entrenched custom to the contrary.

140.    Aware of Ms. Lune's crisis, they chose not to de-escalate or call for a mental health evaluation—which they discussed on body camera footage—but instead to "scour through the Penal Code" to find the most severe charge possible, referring to the felony as "a winner."

141.    This practice of prioritizing punitive charges over providing necessary care was the moving force behind Ms. Lune's malicious prosecution and wrongful incarceration.

142.    The City failed to adequately train and supervise its officers and employees on non-discriminatory interaction with transgender individuals, constituting deliberate indifference.

143.    The City's "Bias-Based Policing" policy (Policy 401) strictly prohibits discrimination on the basis of "gender identity or expression." However, Defendants repeatedly misgendered Ms. Lune in official documents, including the Arrest Report and Court Cover Sheet, listing her sex as "Male."

144.    This was not a mere accident but a reflection of municipal custom, as admitted in a CPL 245.20 Compliance Checklist affirmed by NTPD Captain Todd W. Bush, which stated: "Defendant identifies as a female but is a biological male. CAD & state records reflects (sic) both sexes and paperwork may have discrepancies."

145.    This failure to establish and enforce a policy of respecting individuals' gender identities fostered a hostile environment that contributed to the violation of Ms. Lune's Equal Protection rights.

146.    The City ratified the unconstitutional conduct of its employees.

147.    By allowing the baseless felony prosecution against Ms. Lune—a vulnerable individual they knew to be in a mental health crisis—to proceed for four months, the City, through its final decision-makers, gave its official approval to the officers' actions. This ratification of the malicious prosecution transformed the officers' misconduct into the official policy of the City of North Tonawanda.

148.    These policies, customs, and failures to train were the direct and proximate cause of the violation of Ms. Lune's rights under the First, Fourth, and Fourteenth Amendments, leading to her prolonged and traumatic incarceration, the loss of her home and property, and severe emotional distress.

### SEVENTH CAUSE OF ACTION

**Deliberate Indifference to Serious Medical Needs**
**(Fourteenth Amendment, 42 U.S.C. § 1983)**
**<u>Against Niagara County, the Niagara County Sheriff's Office, and</u>**
**<u>John/Jane Does</u>**

149.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

150.    As a pretrial detainee, Ms. Lune was protected by the Fourteenth Amendment's Due Process Clause. The applicable standard for pretrial detainees is whether the challenged conditions or actions were not rationally related to a legitimate governmental purpose, or were excessive in relation to that purpose.

151.    Niagara County and the Niagara County Sheriff's Office were responsible for providing adequate medical care to pretrial detainees, including Ms. Lune.

152.    Niagara County and the Sheriff's Office knew or should have known of Ms. Lune's serious medical needs, including her demonstrated psychiatric conditions (schizoaffective disorder, bipolar type, psychosis, and substance-use disorder), her traumatic brain injury from a prior neck inj8ury, her severe fungal infection, her cyst outbreaks with bleeding and scarring, and her well-documented 10-year history of hormone replacement therapy.

153.     Despite this knowledge, Niagara County and the Sheriff's Office failed to provide timely mental health intervention despite days of visible psychiatric crisis immediately upon her arrival at the jail.

154.     They denied her hormone therapy despite her well-documented 10-year history of hormone replacement therapy and her express requests for continuation of this medically necessary treatment.

155.     They provided the only topical over-the-counter medication for a severe systemic fungal infection requiring system antifungal treatment.

156.     They failed to treat or evaluate her traumatic brain injury despite knowledge of her prior injury. As a direct and proximate result of these failures to provide adequate medical care, Ms. Lune suffered severe physical and emotional harm.

157.     Niagara County maintained policies, customs, or practices of failing to provide adequate medical care and mental health treatment to pretrial detainees, including transgender detainees.


### EIGHTH CAUSE OF ACTION

**Equal Protection—Gender-Identity Discrimination in Medical Care
(Fourteenth Amendment, 42 U.S.C. § 1983)
<u>Against Niagara County, the Niagara County Sheriff's Office, and
John/Jane Does</u>**

158.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

159.     Ms. Lune is a transgender woman and a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment.

160.    Niagara County and the Niagara County Sheriff's Office, acting under the Color of state law, denied Ms. Lune medically necessary hormone therapy while providing gender-affirming medication to at least one other inmate during the same period.

161.    This selective denial of treatment constituted international discrimination on the basis of gender identity in violation of the Fourteenth Amendment's Equal Protection Clause.

162.    No legitimate penological interest justified the denial of Ms. Lune's hormone therapy, particularly where the jail provided such treatment to other inmates.

163.    As a direct and proximate result of Niagara County and the Sheriff's Office's intentional discrimination and denial of necessary hormone therapy, Ms. Lune suffered severe physical determination, psychological harm, and significant exacerbation of her psychiatric conditions.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court

a)  Enter judgment in favor of Plaintiff and against Defendants on all counts;

b)  Award compensatory damages to Plaintiff in an amount to be determined at trial for loss of liberty, emotional distress, physical injuries, medical expenses, lost property, and other damages;

c)  Award punitive damages against the individual defendants to deter similar misconduct;

d)  Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

e)  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury for all issues so triable.

Dated: March 2, 2026

Respectfully submitted,

**Davenport Law PLLC**

*/s/ Chad A. Davenport*

Chad A. Davenport, Esq.
*Attorney for Plaintiff*
Davenport Law PLLC
6384 Deanna Drive
Hamburg, NY 14075
(716) 217-0328
cdavenport@davenport.law